Aubrey L. STOWELL, Ronald Marcus, Marion T. Martin, Terry Beye and James Escarre, Plaintiffs,

v.

TED S. FINKEL INVESTMENT SERVICES, INC., a Florida Corporation, Ted S. Finkel, Individually, Stanley H. Beck, Jade Coal Company, Ltd., a Florida Limited Partnership, Sanford Kaplan and Georgia National Coal Company, a Florida Corporation, Defendants.

Stanley H. BECK, Third-Party Plaintiff,

v.

James S. MOFSKY, Third-Party Defendant.

No. 77–6497–Civ–JLK.

United States District Court, S. D. Florida.

March 31, 1980.

John I. Van Voris, Shackelford, Farrior, Stallings & Evans, P. A., Tampa, Fla., for plaintiffs.

Michael Olin, Podhurst, Orseck & Parks, Miami, Fla., for defendants Ted S. Finkel, Ted S. Finkel Investment Services, Inc., and Jade Coal Co., Ltd.

Stanley H. Beck, pro se.

Paul R. Larkin, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for third-party defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING PENDENT CLAIM

JAMES LAWRENCE KING, District Judge.

This matter arose upon cross motions for summary judgment. The amended complaint alleges various violations of both federal and state securities laws and common law fraud in the purchase by the plaintiffs of limited partnership interests in Jade Coal Co., Ltd. Counts I and IV allege that the defendants failed to disclose material facts in violation of Rule 10b–5 and Section 10(b) of the Securities and Exchange Act of 1934, Sections 12(2) and 17 of the Securities Act of 1933, and Section 517.301 of Florida Statutes. Counts II and V allege that the defendants failed to register the limited partnership units as securities in violation of Sections 12(1) and 12(5) of the Securities Act of 1933 and Section 517.07 of Florida Statutes. Count III alleges common law fraud.

Plaintiffs Aubrey Stowell, Ronald Marcus, Marion T. Martin, Terry Beye and James Escarre filed motions for partial summary judgment against defendants Ted S. Finkel and Jade Coal Company on Counts II and V. Finkel, Jade and Finkel Investment Services, Inc. filed a cross motion for summary final judgment on all counts.

Summary judgment should be granted if the pleadings, depositions and affidavits filed in the case show that there are no genuine issues of material fact, and that one of the parties is entitled to a judgment

as a matter of law. Rule 56(c) F.R.Civ.P. On the cross motions now before this court, the material facts of one of the issues raised in Counts II and V, the issue of whether the limited partnership units of Jade Coal Co., Ltd. are securities for purposes of either state or federal law, are undisputed. This issue can properly be resolved as a matter of law by the court on summary judgment. Cf. *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir. 1976). Issues of fact remain to be resolved in the issues raised in Counts I and IV and other issues raised in Counts II and V. Hence, the Court grants partial summary judgment on the plaintiffs' and defendants' motions on Counts II and V, and denies the defendants' motion on all other counts. Count III alleging common law fraud is dismissed without prejudice to the plaintiffs. The Court enters the following order accordingly.

## I. FACTS

This action arose from the plaintiff's purchase of units of Jade Coal Company, a limited partnership. These interests were marketed as coal mining sublease tax shelter programs whereby the investors purchased interests in a limited partnership which subleased coal mining property. The limited partnership then paid advance royalties and agreed to sell a percentage of specified coal reserves and right to mine to another company. Jade was one of eight limited partnerships syndicated by Defendants.

*General Background*

In the spring and early summer of 1976, defendant Georgia National Coal Company, a corporation wholly owned by defendant Sanford Kaplan, entered into a ten year lease of approximately 1000 acres of property in Bell County, Kentucky. In June, 1976, offering circulars were prepared for two limited partnerships: Amber Coal Co., Ltd. and Blue Coal Co., Ltd. According to the circulars, both limited partnerships were to sublease property from National and engage, or contract another to engage, in mining operations on the property. It appears from the record that defendant, Stanley Beck, prepared the tax opinions, leases, subleases and corporate documents and that Finkel, or his agents, prepared the remaining portions of the offering circulars. Finkel chartered Finkel Investment Service, a Florida corporation, to serve as the general partner in the Amber and Blue limited partnerships. Within a matter of weeks all limited partnership units in Amber and Blue were purchased and the partnerships were chartered.

A few months later, offering circulars were prepared for two additional limited partnerships: Diamond Coal Co., Ltd. and Emerald Coal Co., Ltd. The circulars proposed that these limited partnerships sublease the remaining property leased by National. Within a few weeks, the units were purchased and the partnerships chartered.

In the Fall of 1976, Kaplan, Finkel and Beck negotiated the purchase of a tract of land adjacent to the property leased by National in Bell County, Kentucky. Kaplan purchased the land and immediately leased it to Georgia National. Offering circulars for four additional limited partnerships were issued shortly thereafter. These partnerships were Crystal Coal Co., Ltd., Indigo Coal Co., Ltd., Jade Coal Co., Ltd., and Silver Coal Co., Ltd. Each circular provided that the respective limited partnership would sublease a tract of property from National when the partnership was fully subscribed and chartered. Finkel served as the individual general partner in all four partnerships.

Over a period of approximately one year, Kaplan, National, Beck, Finkel and Finkel Investment Services syndicated or participated in the syndication of eight limited partnerships. The offering circulars for each were essentially identical, with only slight variations in the number of units, price per unit, amount of royalties to be paid National, and the amount of other fees. Chart I summarizes the limited partnership syndications.

CHART I

SUMMARY OF LIMITED PARTNERSHIPS

| LIMITED PARTNER-SHIPS | LOCATION OF PROPERTY | GENERAL PARTNER | DATE OF OFFERING CIRCULAR | NO. OF INVESTORS | NO. OF PARTNER-SHIP UNITS | PRICE PER UNIT | AGGREGATE CASH SALES PRICE OF UNITS | DATE PARTNERSHIP CHARTERED |
|---|---|---|---|---|---|---|---|---|
| Amber | Bell County | FIS | 6/30/76 | 15 | 15 | $14,000.00 | $210,000 | 7/27/76 |
| Blue | Bell County | FIS | 6/30/76 | 19 | 15 | $14,000.00 | $210,000 | 7/27/76 |
| Diamond | Bell County | FIS | 6/31/76 | 21 | 16 | $14,000.00 | $224,000 | 10/27/76 |
| Emerald | Bell County | FIS | 8/31/76 | 19 | 16 | $14,000.00 | $224,000 | 10/27/76 |
| Crystal | Knox County | Finkel | 11/07/76 | 19 | 16½ | $14,500.00 | $239,250 | 11/29/76 |
| Indigo | Knox County | Finkel | 11/07/76 | 14 | 16½ | $14,500.00 | $239,250 | 11/29/76 |
| Jade | Knox County | Finkel | 11/07/76 | 9 | 16½ | $14,500.00 | $239,250 | 12/17/76 |
| Silver | Knox County | Finkel | 12/07/76 | 11 | 8½ | $14,500.00 | $125,250 | 12/20/76 |

TOTALS ....................................... 127            $1,696,500

## Jade Coal Co., Ltd.

At the time of the purchases of interests in Jade Coal Co., Ltd., all the plaintiffs were either directors or officers of Marcus, Stowell & Beye, Inc., Marcus, Stowell & Beye Securities, Inc., and Marcus, Stowell & Beye Government Securities, Inc. Marcus, Stowell & Beye Government Securities, Inc. is a broker-dealer registered with both the Securities and Exchange Commission and the National Association of Securities Dealers. Plaintiffs hired Tony Biancarosa, a certified public accountant and one of their employees, to seek out an investment for the plaintiffs. It appears from the record that the plaintiffs wanted an investment that offered immediate tax deductions in order to shelter current income. Biancarosa contacted Beck who referred him to Finkel who supplied him with a Jade Coal Co., Ltd. offering circular. The circular contained: a confidential memorandum, a tax opinion, a proposed coal sublease agreement, a coal mining report on the property to be subleased by the partnership, the limited partnership agreement, and a subscription and escrow agreement.

After extensive review of the Jade circular, Biancarosa recommended the Jade investment to the plaintiffs. On December 10, 1976, a check for $20,300.00, ten percent of the purchase price of all the units to be purchased by the plaintiffs, was delivered to Finkel as a down payment for 14 of the 16½ units offered for sale. The plaintiffs' purchases are summarized in Chart II. Five days later Finkel received a check for $182,700.00, representing the balance of the subscription price.

CHART II

PURCHASE OF UNITS OF
JADE COAL CO., LTD.

| NAME | NO. OF UNITS | PRICE |
|---|---|---|
| Ronald Marcus | 3.1108 | $ 45,106.00 |
| Aubrey L. Stowell | 3.7342 | 54,145.90 |
| Terry Beye | 1.6750 | 24,287.50 |
| Marion T. Martin | 2.8800 | 41,760.00 |
| James Escarre | 2.6000 | 37,700.00 |
| | 14.0000 | $203,000.00 |

Once the offering for Jade was fully subscribed, the investors executed the limited partnership agreement included in the offering circular. Jade was chartered on December 17, 1976 pursuant to the limited partnership laws of the State of Florida.

The Jade Limited Partnership Agreement provided that the purpose of the partnership was to engage in the exploration, mining, development and operation of coal leases and to produce and market coal. The profits, losses, deductions and credits were to be distributed 92% to the limited partners and 8% to the general partner. The general partner was vested with management and control of the partnership; the limited partners were prohibited from tak-

ing part in the management or transaction of any business for the partnership. However, limited partners holding 66⅔% of the limited partnership interests could oust and replace the general partner. The general partner, if replaced, would then become a limited partner.

The agreement also restricted the transfer or assignment of interests to any member of a limited partner's family; or, to a corporation, trust or other entity owned by the partner or his family; or, to another limited partner without consent of either the general partner or other limited partners. These named successors would automatically become substituted Jade limited partners provided they complied with all other provisions of the limited partnership agreement. A limited partner was restricted from transferring units to anyone other than those described above unless he first offered to sell the interests to the other partners at a price and on terms no less favorable than those he would include in a sale to a third party. The other partners could accept the offer within 15 days. If the offer was not accepted, the selling partner could sell his interests to the named third person within 60 days and on terms no more favorable than those in the offer to the partners. The third party, with consent of the general partner, could then become a limited partner.

The partnership agreement also governed the disbursements to be made by Jade. In general, the limited partners were to receive no salary or draw; the general partner was to be reimbursed for expenses incurred on behalf of the partnership along with a "commencement fee" of $68,000.00. The commencement fee was to compensate Finkel for services rendered in connection with the production and sale of the first seventy tons of coal. The payment was to be made within the first thirty days of charter and was not conditioned upon the actual production and sale of coal. Thereafter, the general partner was entitled to "management fees" amounting to ten cents per ton of coal mined from the partnership property. These fees were to be paid from the working capital of the partnership and

was to serve as compensation for managing the partnership affairs, supervising preparation of the partnership tax returns, conducting transactions relating to the mining of coal, distributing cash flow, and allocating profits and losses.

Included in the offering circular was the proposed agreement for the sublease of property by Jade from Georgia National. The agreement provided that Jade have the right to mine, remove and sell coal from approximately 770 acres of land for a period of seven years and that Jade pay a nonrefundable minimum annual royalty to Georgia National of $832,200.00. The minimum royalty was payable at a rate of $2.87 per ton as the coal was mined. Upon charter, Jade entered into the sublease with National. Pursuant to the terms of the sublease, Jade paid $110,000.00 to National as an advance royalty and secured the balance with a promissory note.

No coal mining operations have been conducted on the property subleased by Jade. In September, 1977, Finkel Investment Services, did contract with a miner to mine all the property leased and subleased by all the syndicated limited partnerships. However, the only mining activity was a strip mining operation conducted on a limited tract of property subleased by Diamond Coal Co. The miner aborted his operations within a few months after work began. No further mining operations have occurred.

## II.  DISCUSSION

### A.  *Common Law Fraud*

Count III of the complaint filed in this action alleges that the defendants committed common law fraud in connection with the sale of limited partnership units of Jade Coal Co., Ltd. For the reasons set forth below this court is dismissing, sua sponte, Count III. This dismissal is without prejudice to the plaintiffs to pursue all remedies available to them in state court.

A vast majority of the securities cases now pending before this and other courts in this District include allegations of Rule

10b–5 violations. Almost without exception, these cases include counts of common law fraud. Because fraud is a state claim arising from the same set of facts as the federal securities claims, the District Courts have consistently exercised their power of pendent jurisdiction to hear these fraud claims.

■ It appears that the reason these state fraud claims are included in federal 10b–5 claims is to maximize the possible recovery for the plaintiffs, that is, the recovery of punitive damages. Exemplary damages are not available for Rule 10b–5 violations, but are available in Florida for common law fraud. Punitive damages may be recovered under Florida law in any action containing aggravating circumstances such as willfulness, wantonness, maliciousness, gross negligence, recklessness or fraud. *See*, 17 Fla.Jur.2d § 119.

Rule 10b–5 was promulgated pursuant to the authority of the Securities and Exchange Act of 1934.[1] Section 28(a) of that Act provides the remedies for the violation of any of the Exchange Act provisions. The section provides in pertinent part as follows:

> The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

"Actual damages" has been interpreted to mean some form of economic loss and not to include exemplary damages. *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460 (9th Cir. 1977), *Straub v. Vaisman & Company, Inc.*,

540 F.2d 591 (3rd Cir. 1976); *Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974). *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223 (10th Cir. 1970).

Although the Fifth Circuit has not specifically addressed the issue of punitive damages in Rule 10b–5 actions, it has addressed the question of awarding punitive damages pursuant to applicable state law. In *Coffee v. Permian Corporation*, 474 F.2d 1040 (5th Cir. 1973), the Fifth Circuit upheld an award of punitive damages. In that case, the plaintiff claimed that the defendants had engaged in a scheme to defraud him of the value of his stock in a corporation by liquidating the corporation in violation of plaintiff's rights as a minority shareholder. There was no common law fraud count included in plaintiff's complaint, but only a count alleging a Rule 10b–5 violation. The jury was instructed on the Texas law on exemplary damages. The jury found for the plaintiff and awarded punitive damages. The Court of Appeals, while noting that federal law was "not clear concerning exemplary damages in 10b–5 lawsuits" held that exemplary damages may be awarded if allowable under state law, even if not alleged in the complaint.

Judge Clark, concurring in part and dissenting in part, dissented from the award of exemplary damages for two reasons. First, the jury was instructed only on the elements of Rule 10b–5 because no state fraud claim was alleged in the complaint. Second, Rule 10b–5, as interpreted in other circuits, does not permit the award of exemplary damages. Justice Clark agreed with the reasoning of the Circuits rejecting punitive damages and urged that the award of punitive damages be reversed.

The law of punitive damages in 10b–5 claims remains unclear in this Circuit.

---

1. This rule was promulgated under Section 10–b of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970). That section states in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

From the opinion in *Coffee*, however, it is apparent that punitive damages are available *if* such damages are available under state law. In light of this decision, the plain wording of Section 28(a), and the trend apparent in other Circuits, this court holds that exemplary damages are not available in Rule 10b–5 actions, but are available in properly pleaded pendent state claims *if* such damages are allowable under state law; the particular state violation for which punitive damages are sought must be alleged in the plaintiff's complaint.

District Courts sitting in the State of Florida are faced with a unique problem when common law fraud claims are incorporated with federal 10b–5 allegations. The proof of common law fraud under Florida law is much easier than proof of a Rule 10b–5 violation under federal law. In fraud, the plaintiff need only prove negligence on the part of the defendant. Rule 10b–5 requires scienter on the part of the defendant. This problem is especially serious in jury cases as opposed to nonjury cases.

In *Kutner v. Kalish*, 173 So.2d 763, 765 (3rd Fla. DCA 1965), the Florida District Court of Appeals set forth the elements of common law fraud in Florida:

(1) a misrepresentation of material fact.

(2) [a] a knowledge of the representor of the misrepresentation, or, [b] representations made by the representor without knowledge as to either truth or falsity, or [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof,

(3) an intention that the representation induce another to act on it, and

(4) resulting injury to the party acting in justifiable reliance on the representation.

Florida, unlike many jurisdictions, equates a negligent misrepresentation with willful deception. *See, Emerson Electric Co. v. Farmer*, 427 F.2d 1082 (5th Cir. 1970); *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172 (5th Cir. 1968); *Joiner v. McCullers*, 158 Fla. 562, 28 So.2d 823 (1947);

*Watson v. Jones*, 41 Fla. 241, 25 So. 678 (1899). As stated above, exemplary damages are available in both circumstances amounting to negligent misrepresentation, along with those constituting willful deception.

Rule 10b–5, on the other hand, requires a much higher standard for actionable conduct. 17 C.F.R. 240.10b–5 (1976) states in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails . . . .

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Fifth Circuit, in *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir. 1977) delineated what a plaintiff must allege to state a private right of action under 10b–5. These elements are as follows:

(1) scienter on the part of the defendant,

(2) materiality of the misrepresentation or omission

(3) actual reliance and the extent of that reliance by the plaintiff on defendant's statements or lack thereof, and

(4) justifiability of plaintiff's reliance.

The critical difference between the two standards is the "intent" of the defendant. The federal 10b–5 claim requires that the defendant have scienter. Scienter was defined in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), as a mental state embracing an intent to deceive, manipulate, or defraud. In direct contrast,

a Florida common law fraud claim is actionable if the defendant makes a statement without knowledge of its truth or falsity or even if the statement was made under circumstances where the defendant should have known the truth or falsity of a statement. Fraud is actionable under Florida law for mere negligence.

■ The power of pendent jurisdiction over state claims is discretionary with this court and need not be exercised in every case in which state claims are coupled with federal claims. The exercise of pendent jurisdiction is proper where adjudication will foster judicial economy and is convenient and fair to litigants. However, unnecessary decisions of state law should be avoided. The Supreme Court, in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), set out the guidelines for the exercise of the power of pendent jurisdiction. In that case, the Court stated that if it appears that the state issues predominate the case, in terms of proof, scope of issues or remedies, the state claims should be dismissed without prejudice for determination by the appropriate state court. In addition, the Court noted that there may exist reasons independent of jurisdiction that justify dismissal of state claims. As an example, the Court stated that the likelihood of jury confusion in treating divergent legal theories of relief would justify a severance of state and federal claims, precisely the problem faced by District Courts entertaining 10b–5 and Florida common law fraud claims.

The exercise of pendent jurisdiction remains an ongoing issue throughout the pendency of a case before a District Court. In *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139, the Court stated as follows:

> Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might

even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

■ This court has determined that this case, one coupling a Florida common law fraud claim with a federal 10b–5 claim, is one in which the power of pendent jurisdiction should not be exercised. It has become evident to this court that the likelihood of jury confusion is great and that the state law fraud claim constitutes the "real body" of this case.

Were this case to go to the jury with the fraud counts, the jury would have to be instructed on two divergent legal theories of relief. First, the jury must be instructed on the elements of Florida common law fraud including the standard of conduct of the defendants. The jury must be told that if it finds that the defendants committed fraud, either willfully or negligently, that the plaintiffs may recover both compensatory and exemplary damages. The jury must then be instructed on the elements of Rule 10b–5 and be told that under this Rule the defendants must have intended to deceive the plaintiffs; if they find that the defendants so intended, the plaintiffs are entitled only to compensatory or actual damages. In lay terms this means that if the jury finds that the defendants negligently defrauded the plaintiffs, they can recover more damages than if the defendants intentionally deceived the plaintiffs. Or stated in another way, the less culpable conduct of the defendants can result in more damages for the plaintiffs. Perhaps this result can be understood by those trained in the law, but it is sure to confuse lay members of the jury—confusion, which this court believes cannot be overcome by instructions.

As a practical matter, the jury, or the court sitting in its fact finding capacity, when confronted with both fraud and 10b–5 issues, need never reach the federal 10b–5 claim. An affirmative verdict on the state fraud claim would entitle the plaintiff to *at least* the amount of relief available under the federal claim. Conversely, an affirmative verdict on the federal claim would automatically entitle plaintiffs to relief under the state claim since, to draw an analogy from criminal law, the state claim is akin to a lesser included offense of the federal claim. This result not only defeats the purpose of the remedies under Section 28(a), that of making the plaintiff whole without more, but makes the critical issue in the case the state law claim. In essence, the federal courts become the forum for deciding state common law fraud claims. The "real body" of this case is the state fraud claim, while the federal 10b–5 claim becomes only an "appendage" to the state claim and a vehicle for bringing a state law case before a federal forum.

■ This court encourages other District Courts to decline the exercise of pendent jurisdiction over Florida common law claims included in federal 10b–5 actions. The plaintiffs in these actions are not prejudiced by the court's refusal to hear such state claims either at the inception of the case or at any time during the pendency of the case before the Court. The expiration of the statute of limitations during the pendency of the action would not prevent plaintiff's subsequent filing in state court since the running of the statute is tolled upon filing in federal court. Nor would plaintiffs be barred by collateral estoppel or res judicata from asserting their claims in the appropriate state forum. Admittedly, the state fraud claims may arise from the same set of events that give rise to the federal 10b–5 claim. Nevertheless, District Courts should not decide state claims which interfere with the proper adjudication of federal claims in their federal forum. The District Courts must dismiss these claims in order to preserve the proper functions of federal courts.

### B. *Federal Securities Law*

The only issue now before this court on the parties' motions for summary judgment is whether the limited partnership units of Jade Coal Co., Ltd. are securities for purpose of either the federal or state securities laws.

■ Since these limited partnership units are not conventional securities, such as corporate stock, the court must determine whether the interests are "investment contracts" within the meaning of Section 2(1) of the Securities Act of 1933.[2]

The classic definition of an investment contract was set forth by the Supreme Court in *S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The *Howey* test defines an investment contract as:

> a contract, transaction, or scheme whereby a person invests his money in a common enterprise [with the expectation of profits derived] solely from the efforts of [others.]

In *S. E. C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974); the Fifth Circuit stated that the *Howey* test consists of three elements:

> . . . [F]irst, that there is an investment of money; second, that the scheme in which an investment is made functions as a common enterprise; and third that under the scheme, profits are derived

---

**2.** Section 2(1), 15 U.S.C. § 77b(1) defines a security as follows:

" . . . [U]nless the context otherwise requires—

(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

solely from the efforts of individuals other than the investors.

The *Howey* test must be applied in light of the economic realities of the transaction rather than the labels used by the participants in the transaction. *United Housing Inc. v. Forman*, 421 U.S. 837 at 851–852, 95 S.Ct. 2051 at 2060, 44 L.Ed.2d 621 (1975) and *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Moreover, the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey, supra*, 328 U.S. at 229, 66 S.Ct. at 1103, 90 L.Ed. at 1250. Even though broad and liberal interpretations should be employed to reflect the remedial purposes of the Securities Act, *Tcherepnin, supra*, at 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564, 569, the term "investment contract" does not embrace every commercial transaction where investors have been defrauded or misled. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979).

At the outset, the plaintiffs assert that interests in a limited partnership are securities as a matter of law. The plaintiffs argue that interests in a limited partnership chartered pursuant to the laws of Florida are by their very nature securities in that all requirements of the *Howey* test are satisfied: an investment of money in a common enterprise with profits required by

Florida law to be derived solely from the efforts of others. They point to the Fifth Circuit decisions of *Doran v. Petroleum Management Corp.*, 545 F.2d 893 (5th Cir. 1977) and *Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093 (5th Cir. 1973) in support of their position.

The Uniform Limited Partnership Law of Florida requires that limited partners take no part in the control of partnership business and that their liability be limited to the amount of their capital contribution or investment. In general, the Florida statute sets out four rights of the limited partners: (1) to have the general partner maintain partnership books and the right to inspect those books; (2) to demand and receive full information concerning partnership business and an accounting when appropriate; (3) to dissolution of the partnership when ordered by a court of competent jurisdiction; and (4) to receive the share of the partnership profits allocated in the certificate of partnership and return of contribution upon dissolution, or earlier as provided in the partnership agreement. A limited partner participates in excess of these rights at the risk of losing his status as a limited partner, thereby subjecting himself to unlimited personal liability.

It is true that *Nor-Tex* and *Doran* indicate a strong presumption that limited partnership interests, such as the ones involved in this case, are securities. Moreover, the court also notes that the Securities and Exchange Commission routinely treats limited partnership interests as securities.[3]

---

**3.** *See*, Commodity and Securities Exchange, 17 C.F.R. § 240.3a11–1 (1973), where the Securities and Exchange Commission expressly includes limited partnership interests in the definition of "equity security" for purposes of Sections 12(g) and 16 of the Securities and Exchange Act of 1934. The regulation states as follows:

The term "equity security" is hereby defined to include any stock or similar security, certificate of interest or participation in any profit sharing agreement, preorganization certificate of subscription, transferrable share, voting trust certificate or certificate of deposit for an equity security, limited partnership interest, interest in a joint venture, or certificate of interest in a business trust; or

any security convertible, with or without consideration into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any put, call, straddle, or other option or privilege of buying such a security from or selling such a security to another without being bound to do so.

*See also*, S.E.C. Release No. 33–4877, August 14, 1967, which states in pertinent part:

Under the Federal Securities Laws, an offering of limited partnership interest and interests in joint or profit sharing real estate ventures generally constitutes an offering of a 'profit sharing agreement' or an 'investment contract' which is a 'security' within

This court, however, cannot agree with the summary approach suggested by the plaintiffs for determining whether the Jade interests are securities.

██ The Florida Limited Partnership Law does limit the participation of limited partners in partnership business. However, the Florida statute grants the partners a great deal of latitude in drafting their limited partnership agreements. The nature of the interests held by limited partners may vary according to the partnership agreement executed by the parties. In each case the issue is whether, under the partnership agreement entered by the parties, the limited partnership interests meet the criteria of an investment contract. This sort of determination must be made on a case by case basis. The court now turns its analysis to determining whether the Jade interests meet the requirements of the *Howey* test.

1. *Investment of Money.* The first requirement of the *Howey* test is that there be an investment of money by the plaintiffs. "Investment of money" means that the investor must commit his assets to an enterprise or venture in such a manner as to subject himself to financial loss. *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224 (9th Cir. 1974) *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

The record in this case is undisputed that the plaintiffs purchased 14 of the 16 Jade limited partnership units offered for sale and paid a total of $203,000.00 for these interests. Such an outlay of capital into the Jade limited partnership venture is clearly an investment of money for purposes of the federal securities laws.

2. *Common Enterprise.* The second requirement of the *Howey* test is that the parties be engaged in a "common enterprise." The Fifth Circuit, in *Koscot*, expressly endorsed the Ninth Circuit's formulation that "[a] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *S.E.C. v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). In *Koscot*, the Court held that the critical factor in the common enterprise test "is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." The critical inquiry is "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *S.E.C. v. Continental Commodities Corporation*, 497 F.2d 516, 522 (5th Cir. 1974).

The Court finds that the plaintiffs and defendants in this case were engaged in a common enterprise. The fortunes of the limited partners in Jade Coal Co. were interwoven with and dependent upon the efforts of Finkel, the general partner. By the very nature of the partnership interests purchased, the plaintiffs were precluded by state law from participating in the business of the partnership and were dependent upon the expertise of Finkel or his agents in mining coal on the property leased from Georgia National. The actions of the general partner uniformly affected the investors. If Finkel had arranged for mining operations and the operations were profitable, each limited partner would have shared in proportion to his ownership. Likewise, if operations had occurred at a loss, each part-

the meaning of Section 2(1) of the Securities Act of 1933. . . .

. . . [I]f the promoters of a real estate syndication offer investors the opportunity to share in the profits of real estate syndications or similar ventures, particularly when there is no active participation in the management and operation of the scheme on the part of the investors, the promoters are, in effect, offering a 'security'. CCH Fed.Sec.L.Rptr. § 1046 at 2062–2063.

*See also*, S.E.C. Release No. 34–14273, December 15, 1977. See also, Long, "Partnership, Limited Partnership, and Joint Venture Interests as Securities," 37 Mo.L.Rev. 581 (1972). *See also, Goodman v. Epstein*, 582 F.2d 388 (7th Cir. 1978), in which the Seventh Circuit holds that limited partnership interests in a limited partnership established pursuant to Illinois law are securities as a matter of law and is not a question to submit to a jury.

ner would have shared proportionately in any losses. The efforts of Finkel, or the lack thereof, uniformly affected each plaintiff. It is clear that the success or failure of the Jade venture was dependent upon the general partner's ability to initiate and maintain mining operations, and to sell the coal that was mined.

3. *Profits Derived Solely From the Efforts of Others.* The final element of the *Howey* test is that the investors expect a return of profit which will be derived solely from the efforts of others. The discussion of this element is divided into its component parts: "profits" and "solely from the efforts of others."

a. Profits. The defendants argue that "the Jade Coal transaction was simply a highly leveraged means of obtaining an intended tax shelter." Relying upon *United Housing Foundation v. Forman,* supra, and *Sunshine Kitchens v. Alanthus Corporation,* 403 F.Supp. 719 (S.D.Fla.1975), defendants assert that a "substantial consideration" for the plaintiffs' purchase of units in Jade was the potential tax benefits of the investment and such benefits are not "profits" for purposes of the *Howey* test.

The court agrees, as do the plaintiffs, that the tax benefits of the Jade investment were a "substantial consideration" in the plaintiffs' decisions to invest in the defendants' coal mining venture. However, the court disagrees with the defendants' conclusion that this case presents the same investment situation as *Forman* and *Sunshine Kitchens.*

In *Forman,* the plaintiffs purchased shares of common stock in a cooperative housing corporation. In holding that the shares were "securities", the Court of Appeals stated that the deductibility, for tax purposes, of the portions of the tenant investor's monthly rental charge which was applied to interest on the mortgage, was "profit" to the investors. The Supreme Court, in reversing the Court of Appeals, held that the shares were not securities within the meaning of the Securities Acts; the tax benefits received by the co-op investors were not within the scope of "profit"

as contemplated by the securities laws. The Court held that the plaintiffs invested in a place to live and not for "profit".

In *Sunshine Kitchens,* the plaintiff purchased computers from the defendant pursuant to a management lease arrangement. In that case, this court held that the purchase agreement was not an "investment contract" for purposes of the Securities Acts. The court found two of the *Howey* elements lacking. First the court determined that the parties were not engaged in a "common enterprise"; and, second, that the sole inducement for the plaintiff's investment was the expectation of future tax benefits. The court held that such benefits were not "profits."

The case now before the court presents an investment different from the co-op in *Forman* and the management contract in *Sunshine Kitchens.* Here, the profits which the plaintiffs expected to receive were to come from the sale of the estimated two million tons of coal which were to be mined from the Jade property. The fact that the tax benefits to be derived from this investment were an important consideration to the plaintiffs is not surprising nor compelling. It would be an unwise investor, indeed, who invested in a venture without careful consideration of the tax ramifications of that investment. Moreover, tax benefits could be the sole reason why an investor would decide to make an investment or choose one investment over another. So long as there exists an expectation of profit, the tax consequences can properly be the inducement for, as well as an incidental benefit of, an investment. To the extent that *Sunshine Kitchens* states otherwise, it is incorrect.

b. Solely from the efforts of others. The *Howey* test requires that the profits arising from the investment in a common enterprise must be derived solely from the efforts of others. The term "solely" has not been applied literally, but has been interpreted to have a broad and flexible meaning. In *Glen Turner,* 482, the Ninth Circuit held that the issue posed by this element of the *Howey* test is "whether the

efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." The Fifth Circuit, in *Koscot*, expressly adopted the Ninth Circuit test.

The defendants argue that the profits be generated by the coal mining venture were not to be derived solely by the efforts of individuals other than the plaintiffs. They further assert that the plaintiffs had "complete control" over the entire Jade investment. As support for this conclusion, defendants point to the Jade Agreement of Limited Partnership provisions which provide that limited partners owning at least 66⅔% of the limited partners' interests have the right to select a new general partner to replace the original general partner. The defendants contend that "the plaintiffs had the general partner's resignation in their hip pocket" because the plaintiffs, as a group, owned 84.4% of the partnership units and the plaintiffs always acted in concert and in unitary fashion. Therefore, the plaintiffs held more "effective" control than the general partner. Finally, they argue that because Finkel had no coal mining experience—a fact fully disclosed to the plaintiffs—and because Finkel's function was essentially to maintain the books and records of the partnership and to hire a coal miner, his efforts were not the undeniably significant efforts which would affect the success or failure of the enterprise. The

court is not persuaded by the defendants' arguments.

To begin, the Florida Uniform Limited Partnership law prohibits limited partners from participating in the management of partnership business. Florida Statute § 620.10 sets out the rights of the limited partners: the right to have partnership books kept at the principle place of business and available for inspection and duplication, the right to demand true and complete information and formal account of affairs, the right to dissolution by court decree, and the right to receive a share of partnership profits. If a limited partner acts beyond the scope of these restricted rights, he forfeits his status as a limited partner and subjects himself to the same personal liability as a general partner.

The Jade Limited Partnership Agreement tracks the Florida Statutes in setting out the rights and duties of the general and limited partners. The Agreement provides that the general partner shall "manage and control" the partnership. The general partner is given all the rights and powers of a partner in a partnership without limited partners, including the right to dispose of or deal with any partnership property, employ others and conduct all financial affairs. The limited partners, on the other hand, are precluded from taking any part in the management or business of the partnership.[4]

4. Paragraph Ten of the Agreement entitled "Duties, Powers and Rights of the General Partner" states in part as follows:

(a) The General Partner shall manage and control the Partnership, its business and affairs, to the best of its ability and shall use its best efforts to carry out the business and objectives of the Partnership. The General Partner shall devote itself to the business of the Partnership to the extent necessary to conduct it for the greatest advantage of the Partnership and shall render to the Partners, whenever reasonably requested by any of them, a just and faithful account of all dealings and transactions in relation to the business of the Partnership.

(b) The General Partner shall have and possess the same rights and powers as any General Partner in a Partnership without Limited Partners, formed under the laws of the State of Florida, including, without limitation, the

power and right to manage the Partnership property; execute such documents as it may deem necessary or desirable for Partnership purposes; sell, assign, convey, lease, mortgage or otherwise dispose of or deal with all or any part of the Partnership property; borrow money; perform or cause to be performed all of the Partnership's obligations under any agreement to which the Partnership is a party; acquire property from any persons, firms or corporations, or employ, engage, retain or deal with any persons, firms or corporations to act as managing agents, brokers, accountants or lawyers or in such other capacity as the General Partner may determine; and sign checks on Partnership bank accounts and execute and/or accept any instrument or agreement incident to the Partnership business and in furtherance of its purposes. The fact that a Partner is employed by, or is directly or indirectly affili-

The Confidential Memorandum included in the Jade Offering Circular also speaks to the duties of the general partner. After disclosing Finkel's prior business affiliations and the lack of prior experience in coal mining, the memorandum states that Finkel would have the responsibility of supervising the Partnership's operations. The "ultimate authority in all matters affecting the business and affairs of the Partnership" were vested in the general partner, Finkel.

The defendants' "hip pocket" argument misses the point in two respects. First, the ability to replace the general partner is not the critical issue; instead, it is who will perform the general partner tasks, that is, management of the partnership. The defendants have not and cannot, on this record, point to any actions of the plaintiffs which indicate any participation in the business of the partnership. To the contrary, it appears that the most the plaintiffs have done is to repeatedly contact Finkel with reference to the absence of mining on the Jade property.

Second, the securities laws are to be applied in light of the economic realities of a transaction, with the substance of the transaction elevated over the form of investment. As stated in *Howey* and *Koscot*, the security standard must be a resilient standard, one which is capable of adapting to various and creative schemes devised by promoters who seek the use of the money of others. Dynamic scrutiny of investment schemes is essential to carrying out the remedial purpose of disclosure under the Securities Act.[5]

■ This case presents a situation in which form must be disregarded for substance. The fact that 66⅔% of the partnership interest owners could oust the general partner does not lead to the conclusion that the investors were in "control" of the investment. The substance of the situation is that nine investors, five of whom are plaintiffs herein, invested their money in a coal mining venture. The economic reality of that investment was that all investors stood to gain or lose on that investment, depending upon the efforts of the general partner. The mere inclusion of a provision whereby the investors could elect a new general partner to carry on the business of the partnership does not change the substance or character of the investment. The defendants sought and gained the use of the plaintiffs' money on the promise of profit. The Jade investors are entitled to the protections afforded by the securities laws.

The inescapable conclusion to be made from a complete review of the record in this case is that all the partnership efforts or contemplated efforts, were made or were to be made by persons other than the investors. The essential managerial efforts were to be performed by Finkel. His actions were the "undeniably significant ones" in this venture.

ated or connected with, any such person, firm or corporation shall not prohibit the General Partner from employing or otherwise dealing with such person, firm or corporation.

(c) Any document executed by the General Partner while acting in the name and on behalf of the Partnership shall be deemed to be the act of the Partnership.

. . . . .

Paragraph Eleven entitled "Authority of the Limited Partners" provides:

(a) The Limited Partners shall not take part in the management of the business or transact any business for the Partnership and shall have no power to sign for or to bind the Partnership. No salary shall be paid to any partner in his capacity as a Limited Partner.

(b) Limited Partners owning at least sixty-six and two-thirds (66⅔%) percent in interest of the Limited Partners' interests shall have the right to select a new General Partner to replace the original General Partner by written notice sent to the original General Partner. The original General Partner shall then become a Limited Partner possessing all rights and obligations relating thereto.

5. The remedial purposes of the Securities Act of 1933, were expressed as follows:

"The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation against the competition afforded by dishonest securities offered to the public through crooked promotion, . . . ."

See Senate Committee on Banking & Currency, S.Rep.No. 47, 73d Cong., 1st Sess. 1 (1933).

The court concludes from the undisputed facts in the record of this case, that the Jade limited partnership interests are securities. The plaintiffs invested money in a common enterprise with the defendants. The plaintiffs expected a return of profit-profit which would be generated with no effort on their part, but solely through the efforts of the general partner. Having reached this conclusion, the court must now determine whether the interests are also securities for purposes of Florida law.

## C. *State Securities Laws*

The Florida Sale of Securities Law, Fla. Stat.Ann. § 517.02(1), defines "security" as follows:

[U]nless the text otherwise indicates . .

(1) "Security" shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, whiskey warehouse receipt, or other commodity warehouse receipt, or right to subscribe to any of the foregoing; certificates of interest in a profit-sharing agreement, or the right to participate therein; certificate of interest in an oil, gas, petroleum, mineral or mining title or lease, or the right to participate therein; collateral trust certificate, preorganization certificate, preorganization subscription, or any transferable share, investment contract, or beneficial interest in title to property, profits or earnings; interests in or under a profit-sharing or participation agreement or scheme, or any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, certificate or receipt for a security or for subscription to a security.

■ Florida courts follow the same test as the federal courts in determining whether an interest is a "security." As stated in *Levine v. I. R. E. Properties, Inc.*, 344 So.2d 938, 940 (Fla. 3rd DCA 1977):

A security is defined as a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

As in the federal law, the test of whether an investment is a security does not depend upon the technical fulfillment of the elements of the *Howey* test. Instead, "form should be disregarded for the substance, and the emphasis should be on economic reality." A transaction must fall within the "spirit and intention" of the law. *Wiener v. Brown*, 356 So.2d 1302, 1306 (Fla. 3rd DCA 1978).

■ For all the reasons set forth above, the court concludes that the Jade interests are securities for purposes of the Florida Sale of Securities Law.

## D. *Exemption from Registration*

Having determined that the Jade limited partnership interests are securities, the court must now determine whether these interests should have been registered with the Securities and Exchange Commission or whether the issuance was pursuant to an exemption from registration. If the securities were not properly issued, the plaintiffs may then be entitled to rescission of their partnership agreement and return of their investment.

Section 12(1) of the Securities Act of 1933, 15 U.S.C.A. § 77*l*(1), provides that any person who offers or sells a security without proper registration shall be liable to the purchaser for the consideration paid for the security, with interest, less the amount of any income received thereon. The buyer may sue for damages if he no longer owns the security. Section 5(a) and (c) of the 1933 Act, 15 U.S.C.A. § 77e, prohibits both offers to sell and offers to buy, through use of any instrument of interstate commerce or the mails, any security before a registration statement is filed. Thus, Section 5 defines the proscribed conduct of issuers and Section 12(1) provides the remedy for violation of Section 5. The ultimate issue then is whether the defendants violated Section 5; did the defendants offer to sell or receive offers to buy Jade securities prior to properly registering the securities with the S.E.C. or prior to qualifying for an exemption from registration?

No registration statements for the Jade securities were filed with the Securities and Exchange Commission or the Florida Securities Commission. The Confidential Memorandum contained in the Jade Offering Circular states that the Jade interests are not registered with the SEC, nor the FSC, but were offered pursuant to an exemption from registration with both agencies. The exemption affirmatively asserted by the defendants is the "private offering" exemption available under both state and federal law.[6] Therefore, in order to determine whether the defendants have violated Section 5 of the Act, the court must first decide whether the Jade securities were exempt from registration.

### 1. Exemption from Registration Under Federal Law.

The private offering exemption is available from two sources in the federal securities laws: § 4(2) of the 1933 Securities Act and Rule 146 promulgated by the Securities and Exchange Commission. The record indicates that the defendants failed to comply with all the requirements of Rule 146. Therefore, the only exemption available is § 4(2).

Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2) exempts from registration requirements all "transactions by an issuer not involving any public offering." The leading case in the area of "public offering" or private offering exemption is *Securities and Exchange Com.'n v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. In that case, the Supreme Court stated that the exemption should be interpreted in light of the purpose of the 1933 Act, that is, to protect investors by promoting full and fair disclosure necessary for informed investment decisions. The Court held that "the applicability of § 4(1) [§ 4(2)] should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not

involving a public offering.' " The Court added that the focus of inquiry should be on the need of the offerees for the protections afforded by registration.

The Fifth Circuit in *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971) elaborated upon the *Ralston Purina* standard. Incorporating the Supreme Court's emphasis on the purposes of the Securities Act and various SEC releases on private placement, the Court set out the following specific factors to be considered in determining whether a placement is private or public:

1. the number of offerees and their relationship to each other and to the issuer
2. the number of units offered
3. the size of the offering
4. the manner of offering

### 2. Exemption from Registration Under State Law.

The provisions of the Florida Sale of Securities Act are parallel to the provisions of the federal Act. Section 517.07 of the State Act provides that no securities except those exempt from registration may be sold in the state unless the securities are registered as provided in the Act. Section 517.021 provides the remedy for a sale without proper registration. Every sale in violation of Section 517.07 is voidable at the election of the purchaser for the amount of consideration paid, with interest, together with costs and fees. Section 517.07 defines the standard of conduct and Section 517.021 provides the remedy for violations of that standard.

The defendants affirmatively asserted that the Jade securities were exempted from registration under Section 517.06 of the Florida Sale of Securities Act. The plaintiffs contend and the Court agrees that only subsection (10) of Section 517.06 is an available exemption. This subsection pro-

---

**6.** Sections 3 and 4 of the 1933 Securities Act provide exemptions from registration for both securities and transactions. The court has reviewed all possible bases for exemption and

concludes that the § 4(2) public offering exemption is the only exemption applicable to the facts of this case.

vides that the registration requirements do not apply to transactions not exceeding twenty-five subscriptions for shares when no expense is incurred, or no commission, compensation or remuneration is paid or given for, or in connection with the sale or disposition of such securities except to duly licensed dealers or certain other salespersons.

### 3. Burden of Proof of Exemptions in Summary Judgment.

In a motion for summary judgment the moving party has the burden of establishing the existence of no genuine issues of material facts and that the movant is entitled to judgment as a matter of law. Once a movant carries his burden of showing no genuine issue of material fact, it is the non-movant's burden to rebut this showing. *Sweet v. Childs,* 507 F.2d 675 (5th Cir. 1975). In order to successfully defeat a motion for summary judgment more than mere allegations and conclusory statements must be offered by the non-moving party. Instead, the non-moving party must respond by setting forth specific facts showing that there is a genuine issue for trial. *United Steelworkers of America, AFL–CIO v. University of Alabama,* 599 F.2d 56 (5th Cir. 1979). The mere assertion, by affidavit or otherwise, that genuine issues of fact exist for trial does not fulfill the non-movant's obligation, nor does the statement of mere legal conclusions. To permit this type of response to preclude summary judgment would undermine the utility of the procedure. Wright & Miller, *Federal Practice and Procedure*: Civil § 2727. The extreme nature of summary judgment does not lighten the burden of a party against whom a motion is interposed. *Rotermund v. United States Steel Corporation,* 474 F.2d 1139 (8th Cir. 1973). The non-movant is, however, entitled to have every reasonable inference from those facts viewed in favor of the party opposing the motion. *American Telephone and Telegraph Company v. Delta Communications Corp.,* 590 F.2d 100 (5th Cir. 1979). The filing of a motion for summary judgment does not relieve a party of his responsibility to uphold his burden in opposition to the other party's motion. *Newark Morning Ledger Co. v. United States,* 539 F.2d 929 (3rd Cir. 1976).

The determination of whether a placement is public or private is one of fact and must depend upon the circumstances of each case. *Hill York.* The burden of establishing the facts on the issue of exemption rests with the party moving for summary judgment. Once the movant establishes these facts the burden shifts to the non-moving party to either set forth genuine facts in issue or establish their entitlement to judgment as a matter of law.

In their motion for summary judgment on Counts II and V, the plaintiffs argue that the defendants have the burden of proving that they were entitled to an exemption from registration. The plaintiffs rely upon *Ralston Purina* ; the defendants contend that this reliance is misplaced. They argue that although *Ralston Purina* holds that the burden of proof is on an issuer who pleads the exemption, this burden does not apply in a summary judgment setting. The burden is upon the movant to meet the defenses plead by the defendants. The court agrees with the defendants' argument.

The plaintiffs, in their motion, are incorrect in their attempt to shift the burden of establishing the facts of exemption to the defendants. The burden of establishing that no issues of material fact exist on the issue of exemption or other defenses affirmatively asserted by the defendants rests with the plaintiffs as movants. The plaintiffs failed to meet their burden.

Likewise, the defendants failed to meet this same burden as movants in their own motion for summary judgment on Counts II and V. They developed no facts which would entitle the defendants to summary judgment on the issue of exemption. As movants, the burden was clearly theirs. The defendants did not even address the issue of exemption except to offer conclusory statements to the effect that the court need not reach the issue of exemption be-

cause the Jade interests were not securities. The plaintiffs, in response, do not offer facts to establish that the defendants were not entitled to the § 4(2) exemption. The few facts offered on this issue in their motion does not relieve the plaintiffs of their responsibility in responding to the defendants' motion.

Neither the plaintiffs nor the defendants have met their burden as movants on the issue of exemption in their motions for summary judgment. The facts as developed by the parties in their motions, and the record in this case, are inadequate for resolution of the exemption issue. Therefore, the court concludes that whether or not the Jade securities were issued pursuant to an exemption from registration as required by both the federal and state securities laws, must be determined at trial.

### III. CONCLUSION

Count III of the amended complaint is dismissed without prejudice to the plaintiffs. The court concludes that the exercise of pendent jurisdiction over a claim of common law fraud is not appropriate nor prudent under the circumstances of this case.

The cross motions for summary judgment on Counts II and V are granted on the single issue of whether the Jade interests are securities. The court finds that the interests are securities for purposes of both the federal and state securities laws. All remaining issues in Counts II and V and all issues raised in Counts I and IV will be determined by a jury at a trial to be set by further order of this court.